IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMES MUNSON,            )<br>            )<br>    Plaintiff,    )<br>            )<br>v.            )<br>            )<br>DONALD HULICK, et al.,   )<br>            )<br>    Defendants.    ) | Case No. 10-cv-52-JPG-PMF |

### REPORT AND RECOMMENDATION

**FRAZIER, Magistrate Judge:**

Before the Court is defendants' motion for summary judgment (Doc. No. 118). The motion is opposed (Doc. No. 128). Numerous materials have been submitted in support of or in opposition to the motion (Doc. Nos. 119, 127, 129, 130, 133, 134, 135, 136, 137, and 138). This case pertains to the conditions plaintiff James Munson experienced during his confinement in the North 1 Unit of Menard Correctional Center. Munson is proceeding against Donald Hulick, Donald Gaetz, David Rednour, Michael Randle, and Salvador Godinez under 42 U.S.C. § 1983, claiming that they violated the Eighth Amendment's proscription against cruel and unusual punishment. Munson is represented by pro bono counsel. The Court takes this opportunity to express its gratitude to Rebecca M. Christensen and Kevin Fritz for providing exceptional legal services to inmate Munson at the Court's behest.

Summary judgment will be entered if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The facts and all reasonable inferences are drawn in favor of the nonmoving party. *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011).

The Eighth Amendment requires that prison officials ensure that prisoners receive basic human needs such as food, medical care, physical safety, clothing, warmth, sanitation, and

shelter. In order to prove his Eighth Amendment claim against these defendants, Munson must satisfy two elements. The objective element requires evidence that he suffered an injury sufficiently serious to deprive him of the minimal civilized measure of life's necessities. The subjective element requires proof that these defendants responded with deliberate indifference to conditions known to pose a serious threat to Munson's health. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294 (1991); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). As to the objective element of proof, prison conditions may be inconvenient, unpleasant, harsh, and uncomfortable without violating the Eighth Amendment. *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997); *Adams v. Pate*, 445 F.2d 105, 108-09 (7th Cir. 1971). Fear of potential harm is not an actionable injury. *Walker v. Peters*, 233 F.3d 494, 502 (7th Cir. 2000). Inmates are entitled to be provided with adequate food, clothing, bedding, sanitation, medical care, and physical safety. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). As to the subjective element, deliberate indifference can be compared to criminal recklessness, which requires conduct approaching total unconcern for a person's welfare in the face of serious risks. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992).

I. **Objective Element – An injury depriving Munson of the minimal civilized measure of life's necessities**

Defendants first argue that evidence describing the particular conditions of Munson's confinement could not support a finding that he was injured in a manner that deprived him of the minimal level of life's necessities with respect to: the size of his cell, limitations on the amount of his out-of-cell time, the quality of lighting in the cell, the quality of seating inside the cell, the amount of available exercise, limitations on access to cleaning supplies, exposure to paint chips, exposure to excessive temperatures, insufficient ventilation, and exposure to asbestos. Plaintiff responds that his substandard living conditions are exponentially compounded by frequent

lockdowns. He claims that he has suffered actual injury as a result of his exposure to those conditions and that he is also exposed to a substantial risk of future serious injury.

Munson is housed at Menard Correctional Center, a maximum security prison facility populated by violent offenders. Munson is often confined to a small two-man cell providing approximately 40 square feet of shared living space. The length of Munson's confinement is due, in part, to lockdowns that can last for days or weeks at a time.[1] Aside from one other maximum security facility, Menard is the most frequently locked-down facility in the state. In 2011, part or all of the inmate population was locked down on 155 days. Lockdowns occur for various reasons, sometimes in response to violence or a perceived threat of violence. When Munson's housing unit is locked down, he is not initially allowed to leave his cell for meals, recreation time, yard time, or visits to the barbershop. Escorted trips to the visiting room are permitted after the first 48 hours. Munson is also allowed to leave his cell for medical emergencies, weekly showers, and perhaps visits to the library. When his housing unit is locked down, Munson uses water from his sink for more frequent bathing, particularly in summer months. While the facility has reportedly been on lockdown as much as one-third to one-half of the year, it is not clear that this estimate accurately describes Munson's personal experience. Menard has an inmate population in excess of 3700 and lockdowns can be partial – affecting only one or a few housing units. In addition, the conditions experienced during a lockdown are not universal. Rather, lockdowns can progress through phases. For example, inmates assigned to a housing unit that has been placed on a "level 4" lockdown will have greater freedom of movement than inmates assigned to a housing unit that has been placed on a "level 1" lockdown. Some inmates are permitted to leave their cells to perform work assignments during a lockdown.

---

[1] Munson also spends an inordinate amount of time in his cell because he does not have a work detail and only rarely receives visitors. Some of Munson's prior work assignments were terminated because of Munson's misbehavior (Doc. No. 130, pp. 33-36).

When Munson's housing unit is not locked down, his out-of-cell time is limited. He leaves his cell for approximately 15 minutes for each of two daily meals, makes weekly visits to the chapel for approximately 30 minutes, takes showers three times per week, visits the exercise yard and the recreation gym, and makes other authorized movements when he needs to use the services provided at the health care unit, the library, and the barbershop (Doc. No. 130, pp, 28-37). Again, movement to the prison's visiting room is available to Munson but rarely utilized.

Munson has been assigned to various cells in the North 1 unit. The cells are cramped, such that the toilet and bunk practically touch, and in-cell walking is severely restricted to a narrow passage bordered by a bunk bed, a wall, the toilet and the cell door. Munson is able to stand and lay down but he is not able to sit with good posture on the bottom bunk assigned to him. When he does sit on the bottom bunk, he must stoop, crouch or slump. The cell offers no other usable space for seating, aside from the top bunk, which is not available to Munson when it has been assigned to his cellmate. Plaintiff believes that the cramped conditions and restrictions on movement cause him to suffer from a number of physical ailments, including neck, back, joint and leg pain and stiffness (Doc. No. 130, pp. 25, 37). Opportunities to exercise inside the cell are restricted because certain movements in cramped quarters cause inadvertent contact with walls and fixtures, causing scrapes, bumps, and bruises (Doc. No. 130, pp. 27, 50). Munson has difficulty reading and attributes this problem to poor in-cell lighting (Doc. No. 130, p. 22-23). The cells on North 1 are illuminated by one mesh-covered bulb, which is located at the rear of the cell.

Munson reports excessive heat for extended periods of time, compounded by poor ventilation. At least ten months out of the year, Munson finds the temperature inside the cell to be very hot. At times, the heat is unbearable (Doc. No. 130, pp. 56-57). A group visiting the

facility in June, 2011, described the temperature as "stifling hot and oppressive." (Doc. No. 129-2, p. 10). While there are fans and blowers, cooling equipment is not utilized in a manner that is effective in reducing the temperature to a tolerable level (Doc. No. 59-62). On one occasion, Munson measured the temperature in his cell at between 115 to 120 degrees. Munson has cooled himself down with bags of ice, which are distributed to inmates at least once per day during the summer. Munson feels that the heat impairs his ability to breathe. He has visited the health care unit with complaints of lightheadedness, elevated blood pressure, and feeling off-balance (Doc. No. 130, pp. 54 - 57).

 Munson has noticed paint flaking from the ceiling and bars of his cell door. He is concerned that the paint may contain lead. After observing paint flakes in the food served in the cell and paint flakes adhering to his skin, he formed additional concerns about the possibility of leaded paint consumption (Doc. No. 130, pp. 48-51). Munson suffers from sinus problems, nose bleeds, coughing and sneezing, which he attributes in part to deficient ventilation and efforts by staff to remove paint from cell bars (Doc. No. 130, p. 51, 60-62).

 Munson also describes routine difficulties gaining access to certain cleaning supplies (Doc. No. 130, p. 43-45). Rare and irregular access to desired supplies impair his efforts to maintain good sink sanitation. Finally, Munson believes that he is exposed to potentially harmful levels of asbestos (Doc. No. 130, pp, 63-64).

---

 Regarding cell size and seating options, the Court finds no competent evidence that would support a finding that Munson's health or safety has been harmed in a manner that can be described as a deprivation of the minimal civilized measure of one of life's necessities. Outside of Munson's own personal assessment, there is no evidence that cramped quarters combined with

the low-bunk assignment caused a significant medical ailment or other serious injury. While Munson is qualified to describe his own symptoms (stiffness, aches, bumps and bruises), he lacks the expertise to opine that limitations on his in-cell posture or movements cause those symptoms. Munson does receive medical attention and has controlled the severity of his symptoms with over-the-counter and prescribed medications such as Robaxin and Flexeril (Doc. No. 129-5, p. 9). There is no indication that he has made efforts to obtain a high-bunk assignment or request a medical permit for the same. Although members of the public at large are not usually restricted to such cramped quarters, many suffer from poor posture, occasional bumps, bruises, aches, and stiffness. Being free from such (relatively) minor ailments is not a necessity of life, particularly when medical attention and relief of those symptoms is available.

Regarding out-of-cell liberty of movement, Munson's movements are restricted, particularly during periods when his housing unit is locked down. Munson had opportunities to leave his cell six days per week for work assignments. When Munson's housing unit was not locked down, restrictions on his out-of cell time have as much to do with his own behavior and the absence of visitors than acts or decisions that can be attributed to the defendants. Assuming that Munson's housing unit has been locked down repeatedly, the disruption is certainly uncomfortable but also temporary. The degree of restriction varies, with certain liberties (visits and showers) being restored quickly or in increments. When daily showers are not available, Munson retains the ability to cleanse his body inside his cell as often as needed. While that option is not ideal, there is no evidence that exposure to periods of in-cell cleansing as opposed to out-of-cell showers caused an injury or serious harm. The materials do not reveal an objectively serious deprivation flowing from staff-imposed restrictions on Munson's out-of-cell liberty.

Regarding in-cell lighting, the Court has been unable to locate competent evidence demonstrating that Munson suffered a serious injury as a result of deficient lighting. The suggestion that he has reading difficulties and requires corrective lenses to read documents inside of the cell does not show a deprivation of one of life's necessities (Doc. No. 129-5, p. 18). Many people living outside of prison have these concerns.

Regarding temperature and ventilation, Munson has demonstrated periods of excessively high temperatures, especially in summer months. The evidence also suggests that the adverse effects of elevated temperatures are alleviated to some extent through frequent distribution of bags of ice, inefficient use of ventilation equipment, and services available at the health care unit. Munson reported difficulty breathing and said he visited the health care unit "a couple of times" with other complaints (Doc. No. 130, p. 57). The Court has been unable to locate information demonstrating that symptoms logically flowing from Munson's exposure to elevated temperatures posed a significant risk to his health now or in the future.

Regarding cleaning supplies, the Court has been unable to locate information suggesting that exposure to unsanitary sink conditions caused significant harm.

Regarding out-of-cell exercise, the evidence does not clearly describe the amount of time Munson was prohibited from exercising outside of his cell. Even if the Court accepts the statement that the prison was on "full or partial lockdown roughly half the time," the Court lacks details regarding Munson's own personal experience (Doc. No. 129-2, p. 7).

Regarding exposure to asbestos, there is no evidence that Munson is experiencing or is at risk of experiencing a serious injury in the future as a result of any exposure/inhalation of friable materials. While some inspections reveal a potential for damage in some walls and ceilings (Doc. No. 129-3, p. 38-39, 48-49, 54-55, 60-61, 66-67), no evidence links those findings to an injury, threatened or otherwise.

Regarding paint chips, the Court has been unable to locate evidence linking Munson's exposure to or inadvertent ingestion of paint chips to an objective deprivation. Worry, concern about living in an environment that might lead to health problems in the future are commonly experienced outside of prison.

In sum, Munson's Eighth Amendment claim fails on the objective element of proof.

**II.     Subjective Element -- deliberate indifference**

As mentioned above, the subjective element of Munson's claim requires evidence of deliberate indifference: that one or more of these defendants was aware of a serious deprivation and responded in a manner showing indifference to the harm. The evidence has been reviewed for information suggesting that any of the defendants were subjectively aware of a serious risk to Munson's health and responded with total unconcern, reflecting a conscious and culpable refusal to prevent harm.

Donald Hulick was the warden at Menard Correctional Center between 2006 and 2008. He was aware that cells in North 1 are smaller than usual and that lockdowns were approved in response to incidents of violence, perceived assault or a potential for violence (Doc. No. 129-8, pp. 20-23, 53). He was concerned about the lockdowns and tried to bring the facility off lockdown rapidly (Doc. No. 129-8, p. 35). He was also aware that inmates who did not have a work assignment would be confined to the cell approximately 21-22 hours a day (Doc. No. 129-8, p. 29). He had no concerns about the size of the cells in the North 1 unit, in-cell lighting, or peeling paint (Doc. No. 129-8, pp. 54-56, 58). His understanding was that cleaning supplies were distributed to inmates weekly, on a schedule (Doc. No. 129-8, p. 57). Fans, ice, and ice water were distributed to inmates to alleviate the effects of hot temperatures (Doc. No. 129-8, pp. 59-60).

Donald Gaetz was the warden at Menard beginning in late 2009 or early 2010. All parts of the prison were regularly inspected by people who reported to him. Defendant Gaetz was present in the North 1 unit from time to time. He was aware of complaints about excessive heat and cramped spaces and generally referred those types of concerns to an assistant warden (Doc. No. 129-11, pp. 42, 43, 57). Plaintiff saw the warden sporadically and may have spoken with him on one occasion in 2009, perhaps, about out-of-cell recreation time. The warden explained that the gym was closed due to a staffing issue (Doc. No. 129-5, p. 9-10).

Michael P. Randle was the director of the IDOC in 2009 and 2010. He visited Menard but was not involved in day-to-day operations at that facility (Doc. No. 129-6, pp. 11-13).

David Rednour was warden at Menard for approximately one and one-half years. He toured the cell houses and was present in the North 1 unit from time to time. He was aware that cells in North 1 are smaller than usual. He disagreed with statements suggesting that, on average, inmates spend roughly 21 to 22 hours a day locked in their cells. If he felt that there was an immediate threat of danger, he would put the facility on lockdown. The decision to keep the facility locked down would be made by a deputy director. He reviewed some grievances but was not aware of inmate complaints regarding cell size in North 1, lack of in-cell seating, inadequate recreation time, lack of access to cleaning supplies, excessive heat, poor ventilation, or exposure to mold or asbestos. Ice water was distributed and fans were loaned to some inmates confined behind a solid door (Doc. No. 129-9, pp. 13, 19, 25-29, 45-46; Doc. No. 129-10, pp. 22-23).

Salvador Godinez is the director of the IDOC. He has visited Menard approximately 30 times. On those occasions, inmate concerns focused on transfers to a different part of the state or a less secure facility (Doc. No. 129-7, p. 17). One of his main concerns is preventing lockdowns

by preventing prisoner assaults on other prisoners or prison employees (Doc. No. 129-7, pp. 20-26).  He is not aware of out-of-cell time being a matter of concern (Doc. No. 129-7, pp. 50-51).

This evidence could not support a finding that any defendant was personally involved in causing or creating a deprivation of Munson's Eighth Amendment right to be free from cruel and unusual punishment.  Furthermore, the evidence does not reasonably suggest that the supervisory officials were actually aware that Munson was experiencing a serious deprivation and failed to take reasonable steps to prevent harm or otherwise responded with a total lack of concern.

### III.    Qualified Immunity/Injunctive Relief

In light of the conclusions reached above, the remaining arguments are not discussed at this time.

### IV.    Conclusion

IT IS RECOMMENDED that defendants' motion (Doc. No. 118) be GRANTED.  Judgment should be entered in favor of defendants Donald Hulick, Donald Gaetz, David Rednour, Michael Randle, and Salvador Godinez on plaintiff's claim for relief.

SUBMITTED:  <u>August 15, 2014</u>.

                 <u>s/Philip M. Frazier</u>
                 **PHILIP M. FRAZIER**
                 **UNITED STATES MAGISTRATE JUDGE**